**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 97-40930
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAVIER LOPEZ CANTU,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

February 3, 1999

Before SMITH, DUHÉ, and WIENER, Circuit Judges.

WIENER, Circuit Judge.

Defendant-Appellant Javier Lopez Cantu appeals his convictions
for (1) conspiracy to possess 1,000 kilograms or more of marijuana
with intent to distribute and (2) conspiracy to launder drug
proceeds. He further challenges the jury's verdict of forfeiture
of property under 21 U.S.C. § 853. For the reasons set forth
below, we affirm both the convictions and the forfeiture verdict.

I.

FACTS AND PROCEEDINGS

In April 1995, Mark Miller was stopped by police for a routine
traffic violation about 200 miles outside of Houston. When the
police discovered that Miller was transporting approximately 200

pounds of marijuana, he agreed to cooperate with them.

The police disabled Miller's vehicle and instructed him to call the persons for whom he was delivering the marijuana and ask them for assistance. He did so, and approximately four hours later, Fabian Cavazos and the defendant-appellant's brother, Roy Cantu, arrived driving separate vehicles. The officers observed the two men transfer the marijuana into the newly-arrived vehicles, then arrested them. After Miller, Cavazos, and Roy Cantu identified defendant-appellant Cantu as the leader of the marijuana-distribution organization for which they worked, officials investigated and eventually arrested him. The government's evidence against Cantu at trial consisted largely of (1) testimony from some of his employees who had already pleaded guilty to narcotics offenses regarding Cantu's leadership role in a narcotics ring and (2) documentary evidence, such as phone records and ownership records of vehicles and residences, linking Cantu to the marijuana organization.

The jury convicted Cantu of the conspiracy charges, but acquitted him of the charge of possession of marijuana with intent to distribute. The jury also entered a verdict of forfeiture as to eleven properties.

On the morning of the second day of jury deliberations during the guilt-innocence phase of the trial, but before the jury had begun that day's deliberations, a juror named James Almaraz reported to the court that the night before he had been approached

2

by Rene De La Rosa regarding the trial. With the attorneys for both parties present, the district court held a hearing in chambers. In response to questioning by the court, Almaraz reported that he was approached by De La Rosa who stated that he was "real good friends with [Cantu] and he knows what [Cantu] does, but he just told me that he would appreciate if I would testify [sic] that [Cantu] was innocent." Almaraz also informed the court that one of his girlfriend's coworkers had passed a message to him through his girlfriend that, if he voted to acquit Cantu, the coworker would "give [him] some money." Almaraz indicated that he had not been approached prior to the night before he reported the incidents to the court and had not talked to anyone about what had occurred.

The district court allowed counsel for both parties to question Almaraz and then asked whether they would consent to the removal of Almaraz from the jury. Even though Cantu's attorney stated that he was not willing to consent to Almaraz's removal until he spoke to his client, the district court dismissed Almaraz immediately and then instructed the remaining jurors not to consider the excusal of the twelfth juror for any purpose.

After the jury returned its guilt-innocence verdicts and while it was deliberating on the forfeiture issue, Cantu requested permission to interview the remaining eleven jurors to determine whether any of them had been approached by anyone or whether any of them had heard of the incidents involving Almaraz. The district

3

court denied this request. Cantu later filed a motion and supporting memorandum, seeking meaningful access to the jurors. In these filings, Cantu's counsel asserted that he had learned from an unnamed source that one of the remaining jurors had been told that Cantu had been convicted of a drug trafficking offense on at least one prior occasion. Cantu repeated this assertion in the memorandum he submitted in support of his motion for a new trial. The district court denied both motions.

In addition to challenging the district court's handling of the failed jury tampering incident, Cantu asserts for the first time on appeal that the district court (1) through its questioning of particular witnesses, improperly created the impression that the court was partial to the government; (2) erred in admitting hearsay evidence; and (3) erred in permitting the eleven members of the jury who remained after the dismissal of Almaraz to render a verdict on the forfeiture issue, rather than dismissing the jury and granting Cantu an entirely new trial before a new jury, limited to forfeiture.

II.

ANALYSIS

A. Jury Tampering Incident

1. Standard of Review

We review a district court's determination that the jury was not improperly tainted by extrinsic evidence under the clearly

4

erroneous standard,[1] and its choice of methods to investigate the possibility of extrinsic taint for abuse of discretion.[2] We also review a district court's denial of a motion for a new trial for abuse of discretion.[3]

2.   Merits

Cantu asserts that the district court erred in (1) failing to conduct an evidentiary hearing to investigate whether the remaining jurors had been exposed to extrinsic influence; (2) refusing to grant Cantu access to the remaining jurors; and (3) refusing to grant Cantu's motion for a new trial.

"[T]he remedy for allegations of juror impartiality is a hearing in which the defendant has the opportunity to prove actual bias."[4] The district court is not, however, required to conduct a "full-blown evidentiary hearing in every instance in which an outside influence is brought to bear on a petit jury."[5] Here, in the presence of defense counsel and the prosecutor, the district court questioned Juror Almaraz in chambers regarding the two attempted tampering incidents that he had reported. Counsel for

---

[1]United States v. Kelley, 140 F.3d 596, 608 (5th Cir.), cert. denied, 119 S. Ct. 247 (1998).

[2]United States v. Jobe, 101 F.3d 1046, 1058 (5th Cir. 1996) (quoting United States v. Roberts, 913 F.2d 211, 216 (5th Cir. 1990)), cert. denied, 118 S. Ct. 81 (1997).

[3]United States v. Freeman, 77 F.3d 812, 815 (5th Cir. 1996).

[4]Smith v. Phillips, 455 U.S. 209, 215 (1982).

[5]United States v. Ramos, 71 F.3d 1150, 1153 (5th Cir. 1991).

5

both parties were present throughout the hearing and were allowed to examine Almaraz. In light of his responses, the court determined that, although Almaraz should be dismissed, it was not necessary to voir dire the remaining jurors because Almaraz had told no other member of the jury about the incidents, and no other juror had reported any such incident.[6]

The hearing conducted by the district court was adequate to determine whether it was necessary to interview the remaining jurors. Almaraz indicated that the two incidents occurred the night before he reported them to the court and that he had not told anyone else about what had occurred. In light of these answers and in view of the potential disruptive effect of questioning all remaining jurors,[7] the district court did not abuse its discretion in the way it handled the allegations of outside influence on the jury or in denying Cantu's motion for a new trial.[8]

B.  Judicial Questioning

---

[6]See United States v. Tarpley, 945 F.2d 806, 811 (5th Cir. 1991) ("[I]t is not sufficient to trigger the requirement of further investigation that a juror have had contact with an outside source of information. Rather, the defendant must show that extraneous prejudicial material had likely reached the jury.") (citation and quotation omitted).

[7]See Ramos, 71 F.3d at 1153 ("In determining whether to conduct a hearing in a case such as this, the court must balance the probable harm resulting from the emphasis such action would place upon the misconduct and the disruption involved in conducting a hearing against the likely extent and gravity of the prejudice generated by the misconduct.").

[8]See id. at 1153-54; United States v. Posada-Rios, 158 F.3d 832, 876-77 (5th Cir. 1998).

6

1.    Standard of Review

Because Cantu did not object contemporaneously to the instances of witness interrogation of which he now complains, we review the district court's questioning of witnesses for plain error.[9] "Plain error occurs when the error is so obvious and substantial that failure to notice and correct it would affect the fairness, integrity, or public reputation of judicial proceedings and would result in manifest injustice."[10]

2.    Merits

That "[a] federal judge may comment on the evidence, question witnesses, bring out facts not yet adduced, and maintain the pace of the trial by interrupting or setting time limits on counsel" is settled beyond peradventure.[11]  In so doing, however, a judge cannot appear to be partial to the prosecution.[12]  When considering whether a court appeared impartial, we must review the entire record.[13]  Our

---

[9]United States v. Mizell, 88 F.3d 288, 297 (5th Cir.), cert. denied, 117 S. Ct. 620 (1996).

[10]Id.

[11]United States v. Williams, 32 F.3d 921, 928 (5th Cir. 1994); see also Fed. R. Evid. 614(b) ("The court may interrogate witnesses, whether called by itself or by a party.").

[12]United States v. Saenz, 134 F.3d 697, 702 (5th Cir. 1998); United States v. Wilson, 135 F.3d 291, 307 (5th Cir.), cert. denied, 118 S. Ct. 1852 (1998); Herman v. United States, 289 F.2d 362, 365 (5th Cir. 1961) ("The trial judge has a duty to conduct the trial carefully, patiently, and impartially.  He must be above even the appearance of being partial to the prosecution.").

[13]United States v. Carpenter, 776 F.2d 1291, 1294 (5th Cir. 1985).

task is to determine whether the judge's behavior was "so prejudicial that it denied the defendant a fair, as opposed to a perfect, trial."[14] "To rise to the level of a constitutional error, the district judge's actions, viewed as a whole, must amount to an intervention that could have led the jury to a predisposition of guilt by improperly confusing the functions of judge and prosecutor."[15]

Cantu asserts that reversal of his conviction is required because the district court's questioning "was pervasive, often leading, and designed to rehabilitate the credibility of government witnesses or undermine counsel for Defendant's questioning on cross-examination." Cantu rests his argument primarily on United States v. Saenz,[16] a case in which we held that the same district court's questioning of witnesses created an appearance that the court was partial to the prosecution and thereby denied the defendant a fair trial.[17]

In reaching our holding in Saenz, we emphasized that such a result obtained only because of the "unusual combination of circumstances" the case presented.[18] Most importantly, the

---

[14]United States v. Bermea, 30 F.3d 1539, 1569 (5th Cir. 1994); see also United States v. Davis, 752 F.2d 963, 974 (5th Cir. 1985).

[15]Bermea, 30 F.3d at 1569; see also Davis, 752 F.2d at 974.

[16]134 F.3d 697 (5th Cir. 1998).

[17]Id. at 704-13.

[18]Id. at 699.

8

government's case in Saenz rested almost entirely on the testimony of a codefendant who was cooperating with the prosecution.[19] As a result, the outcome of the case hinged on whether the jury believed the testimony of the government's witness or that of the defendant, who ⸺ unlike Cantu ⸺ testified in his own defense. In light of the crucial nature of the testimony of these two witnesses and the scant evidence supporting conviction (other than the cooperating witness' testimony), we held that the district court's substantial questioning of both key witnesses in a manner that could have appeared to convey partiality toward the prosecution required that we reverse the defendant's conviction and remand the case for a new trial.[20]

The present case is distinguishable from Saenz in several key respects. First, rather than resting on the testimony of a single witness, the government's case against Cantu featured numerous substantive witnesses, including both coconspirators and law enforcement officials. Second, Cantu did not testify in his own defense, so the district court had no opportunity to question ⸺ let alone, improperly question ⸺ him.[21] Third, the district

---

[19]Id. at 702.

[20]Id. at 712-13.

[21]See id. at 709 ("This Court is particularly sensitive to a trial judge's questioning of the defendant, because [w]hen a defendant takes the stand in his own behalf, any unnecessary comments by the court are too likely to have a detrimental effect on the jury's ability to decide the case impartially.") (citation and quotation omitted).

9

court's questioning of witnesses was not nearly as extensive as that in Saenz.[22] In sum, although the district court's questioning in the present case may bear some similarity to that in Saenz, the unique combination of factors that led to a reversal in Saenz is absent here. We thus conclude that the district court's examination of witnesses did not constitute plain error.

C. Hearsay

1. Standard of Review

We review a district court's evidentiary rulings for abuse of discretion.[23] Should we determine, however, that the district court erred in admitting hearsay evidence, we must determine additionally whether the admission of the testimony was harmless.[24]

2. Merits

Cantu argues that on four occasions the district court erred in admitting hearsay evidence and that, when viewed cumulatively, the admission of this evidence was not harmless. Cantu first complains that the district court improperly admitted a government

---

[22]In Saenz, the district court's questioning of the government's cooperating witness consisted of over 18 percent of his testimony —— 264 out of the 1460 lines of transcript. Id. at 704 n.3. The court's questioning of the defendant during direct examination made up 23.5 percent of the direct examination (253 out of 1075 lines). The court did not significantly interrupt the cross-examination or redirect of the defendant. Id. at 712 n.7. In the present case, the district court's questioning of witnesses did not approach this level of intrusiveness.

[23]United States v. Clements, 73 F.3d 1330, 1334 (5th Cir. 1996).

[24]United States v. Dickey, 102 F.3d 157, 163 (5th Cir. 1996).

10

exhibit consisting of certified copies of public records from Hidalgo County, Texas, including court minutes reflecting a guilty plea by one Javier Lopez Cantu in a misdemeanor marijuana case. As a preliminary matter, Cantu did not object to the admission of the government exhibit on hearsay grounds. Rather, he objected only that the records were irrelevant because the government had failed to prove that the person identified in the records was the defendant, a separate contention from the one that Cantu raises on appeal.

Again, when a party fails to object to the admission of evidence, we review the district court's ruling only for plain error.[25] The district court's admission of the government exhibit in question did not constitute plain error — indeed, it did not constitute error of any sort. First, the certified court records are public records, thereby falling within the public records exception to the hearsay rule.[26] Moreover, to the extent that Cantu is arguing that the admissibility of the records was dependent on the fulfillment of a condition of fact — i.e., that Cantu was the person identified in the records — the district court only needed

---

[25]Fed. R. Evid. 103(d); Peaches Entertainment Corp. v. Entertainment Repertoire Assocs., Inc., 62 F.3d 690, 694 (5th Cir. 1995); see supra text accompanying note 10.

[26]See Fed. R. Evid. 803(8); United States v. Vidaure, 861 F.2d 1337, 1340-41 (5th Cir. 1988) (holding certified and exemplified copies of defendant's convictions and copies of documents contained in his "pen packet" obtained from the Texas Department of Corrections were properly admitted in evidence under hearsay exception for public records and reports).

11

to determine whether the jury could reasonably find that the records referred to this Javier Lopez Cantu.[27] Not only do the documents refer to Cantu by his full name, they reflect that Cantu was represented by Ed Cyganiez, an attorney who testified at trial that he represented Cantu in the present case and was hired by Cantu to represent his brother, Roy Cantu, on two other occasions. In light of this evidence, the district court did not err in finding that condition of fact was sufficiently established to admit the evidence.

Cantu next contends that the district court erred when it allowed his sister-in-law, Graciela Cantu, to testify that Cavazos worked for Cantu. Cantu's assertion is baseless. When defense counsel objected to Graciela Cantu's testimony at trial, the district court instructed the prosecutor to establish whether the witness had personal knowledge of Cavazos's relationship to Cantu.[28] Graciela Cantu then testified that she believed that Cantu was Cavazos's boss because she had personally observed Cantu giving Cavazos orders while they were unloading and storing marijuana in her house. That her testimony consisted of a conclusion about the

---

[27]Huddleston v. United States, 485 U.S. 681, 689-90 (1988).

[28]See Fed. R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); Davis, 792 F.2d at 1303-04 (holding officer's testimony that he personally knew when guns were released by police department was sufficient to establish testimony not hearsay given officer's "personal connection to subject matter").

relationship between Cantu and Cavazos, rather than a simple description of a concrete fact, does not render it inadmissible hearsay. "Personal knowledge can include inferences and opinions, so long as they are grounded in personal observation and experience."[29] The district court did not err in permitting Graciela Cantu to testify that Cavazos worked for Cantu, given that her testimony was grounded in her personal observations of the interaction of these two men.[30]

Cantu also challenges the district court's admission of testimony by a Cantu employee, Alfonso Zaleta, describing a conversation among himself, Sergio Gomez, and Rafael Ornelas — the last two of whom are Mexican nationals — in which Gomez and Ornelas identified Cantu as a drug trafficker. According to Zaleta's testimony, Gomez and Ornelas demanded that Cantu pay, and Cantu agreed to pay, a $50,000 "tariff" to move marijuana through Matamoros. Zaleta's testimony thus established that there was a conspiracy among Cantu, Gomez, and Ornelas to move marijuana through Mexico into the United States and that Gomez's and Ornelas's statements regarding Cantu were in furtherance of that

---

[29]United States v. Neal, 36 F.3d 1190, 1206 (1st Cir. 1994) (citation and quotation omitted), cert. denied, 117 S. Ct. 519 (1996).

[30]See Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc., 630 F.2d 250, 262-63 (5th Cir. 1980) (holding witness' testimony that he understood individual bought cattle for defendant based on fact that individual spoke to one of defendant's employees four or five times a day was sufficiently grounded in witness' personal knowledge).

13

conspiracy — that is, to ensure that they were paid for sheparding Cantu's drugs through Matamoros. As coconspirator statements made in furtherance of a conspiracy are admissible, the district court did not err in permitting Zaleta's testimony.[31]

Last, Cantu asserts that the district court erred in allowing Special Agent John Wood to testify, over Cantu's hearsay objection, that — based on statements made by Cavazos and Antonio Sepulveda, another of Cantu's employees — Wood believed that Cantu was aware that he was under investigation. The implication of Wood's testimony was that Cantu's awareness of the investigation explained why the police did not find significant quantities of drugs or drug ledgers when they searched Cantu's residence.

The government does not contest that Agent Wood based his testimony, at least in part, on information other than his own personal knowledge.[32] Neither does the government argue that Wood's testimony was offered for a purpose other than to establish the truth of the matter asserted, i.e., as background information to explain the actions of the investigators.[33] Rather, it contends

---

[31]See United States v. Flores, 63 F.3d 1342, 1377 (5th Cir. 1995).

[32]Although the government affixes the qualifier "in part" to its admission that Agent Wood based his testimony on hearsay, Wood did not so hedge his testimony, stating: "I believe [Cantu] did [know that he was under investigation], based on statements given by other people."

[33]See United States v. Carrillo, 20 F.3d 617, 619-20 (5th Cir. 1994).

14

that Agent Wood was an expert either in the investigation of Cantu's case or the search of Cantu's residence, and was thus permitted to testify regarding that search based on any information that he discovered during the investigation. Significantly, the government neither requested that the district court qualify Wood as an expert nor laid any foundation for treating him as such.

Were we to approbate the government's theory, then any time that law enforcement officials have more than a tangential relationship to an investigation of a defendant, they would be permitted to testify to any conclusion they have reached, even when such a conclusion is based on the out-of-court statements of persons not before the court.[34] Although it is clear that there can be circumstances under which a law enforcement official can testify as an expert in a criminal case,[35] permitting an official to testify regarding a matter that requires no specialized knowledge[36] without

---

[34]See Fed. R. Evid. 706 ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.").

[35]See, e.g., United States v. Gresham, 118 F.3d 258, 266 (5th Cir. 1997) (ATF agent testified as expert that, based on, inter alia, discussions with manufacturers, corporate literature, and reference materials, components of firearm had been manufactured outside Texas and traveled through interstate commerce, thus establishing interstate commerce nexus required for conviction under 18 U.S.C. § 922(g)), cert. denied, 118 S. Ct. 702 (1998).

[36]Wood testified only that, based on "statements [he] was given by other people," Wood believed that Cantu knew he was under investigation. The agent did not testify that he believed that the

15

requiring the government to lay any foundation regarding the witness' expertise in the subject matter, based on the simple fact that the official was involved in the investigation of the defendant, would raise serious concerns.[37] As we conclude, however, that, even assuming that Agent Wood's testimony constituted impermissible hearsay and opinions, the admission of his testimony was harmless, we need not determine whether the district court erred in admitting the testimony.

To ascertain whether the admission of the inadmissible evidence was harmless, we must decide, in light of all of the

---

search of Cantu's premises revealed no drug paraphernalia because Cantu was aware of the investigation —— testimony which, at a minimum, would have arguably relied in part on Wood's experience as an investigator; rather such a conclusion was simply a possible implication of his testimony. It requires no specialized knowledge —— unless one characterizes knowledge obtained through hearsay statements as specialized —— to testify that a person was aware that he was under investigation.

[37]See United States v. Johnston, 127 F.3d 380, 393-96 (5th Cir. 1997) (holding prosecutor's questioning of law enforcement officials designed to introduce indirectly hearsay testimony of informants and other law enforcement officials constituted "serious prosecutorial misconduct"), cert. denied sub nom. United States v. Lowery, 118 S. Ct. 1174 (1998); Gochicoa v. Johnson, 118 F.3d 440, 445-46 (5th Cir. 1996) (holding law enforcement official's testimony based on informant's out-of-court statement improperly circumvented hearsay prohibition), cert. denied, 118 S. Ct. 1063 (1998); Fed. R. Evid. 803(8)(B) (excluding from "public records" exception to hearsay rule "matters observed by police officers and other law enforcement personnel" in criminal cases); Fed. R. Evid. 803(8) advisory committee's note ("In one respect, however, the rule with respect to evaluative reports under item (c) is very specific: they are admissible only in civil cases and against the government in criminal cases in view of the almost certain collision with confrontation rights which would result from their use against the accused in a criminal case.") (emphasis added).

16

evidence, whether that evidence actually contributed to the jury's verdict.[38]   Here, multiple witnesses — coconspirators, law enforcement agents, and third parties — offered testimony concerning Cantu's direction of, and relationship to, the marijuana distribution ring.  Given all this evidence, we are satisfied that Agent Wood's conjectural testimony regarding the absence of narcotics evidence at Cantu's residence when it was searched by the police had little, if any, effect on the jury's verdict. Accordingly, the admission of the testimony was harmless error if it was error at all.[39]

D.   Forfeiture Issue

   1.   Standard of Review

   We review for abuse of discretion a district court's decision to permit an eleven-member jury to return a verdict after the district court has dismissed the twelfth juror for just cause.[40]

   2.   Merits

   Cantu contends, without citation, that the district court violated Federal Rule of Criminal Procedure 23 when it permitted the jury — consisting as it did of only eleven members following the dismissal of Juror Almaraz — to consider the issue of forfeiture.  Rule 23(b) states that juries "shall be of twelve,"

---

[38]Dickey, 102 F.3d at 163.

[39]See id.

[40]Fed. R. Crim. P. 23(b); United States v. O'Brien, 989 F.2d 983, 986 (5th Cir. 1990).

unless the parties "stipulate in writing with the approval of the court that the jury shall consist of any number less than twelve."[41] The rule further provides, however, that "[e]ven absent such stipulation, if the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court a valid verdict may be returned by the remaining 11 jurors."[42]   Cantu asserts that the forfeiture proceedings constituted a "wholly separate trial" from the guilt-innocence stage of the proceedings, and that, because he did not consent to going forward with only eleven jurors, the district court abused its discretion.  As Cantu mischaracterizes the nature of the forfeiture proceeding in this case, his assertion is without merit.

Federal Rule of Criminal Procedure 31(e) provides: "If the indictment or the information alleges that an interest or property is subject to criminal forfeiture, a special verdict shall be returned to the extent of the interest or property subject to forfeiture, if any."[43]  The Supreme Court has held that "the right to a jury verdict on forfeitability does not fall with the Sixth Amendment's constitutional protection,"[44] so the question whether

---

[41]Fed. R. Crim. P. 23(b).

[42]Id.

[43]Fed. R. Crim. P. 31(e).

[44]Libretti v. United States, 516 U.S. 29, 48 (1995).

18

the district court erred in proceeding with eleven jurors is simply a matter of statutory construction, not one of constitutional proportions.

Cantu cites no authority in support of his assertion that, because Juror Almaraz was excused, Cantu was entitled to a separate trial before a different jury on the forfeiture issue. As our discussion in United States v. Cauble[45] indicates, Rule 31(e) does not require that the forfeiture issue be decided by a separate jury. In addressing the preferred procedure when a special forfeiture verdict is necessary, we stated:

> To ease the jurors' task in determining guilt or innocence, the forfeiture issue should be withheld from them until after they have returned a general verdict. . . . Such a bifurcated trial — using, of course, only one jury — is not only convenient for the judge and fairer to the defendant. It also prevents the potential penalty of forfeiture from influencing the jurors' deliberations about guilt or innocence.[46]

Inasmuch as Rule 31(e) does not require that the forfeiture allegations be heard by a separate jury, it follows that the authority to proceed with eleven jurors under Rule 23(b) applies not only to the guilt-innocence phase of Cantu's trial, but also to the special verdict portion of the proceeding. In other words, Rule 31(e) applies to the single trial of which there are two parts

---

[45]United States v. Cauble, 706 F.2d 1322, 1347 (5th Cir. 1983).

[46]Id. at 1348 (emphasis added).

19

— guilt-innocence and forfeiture.[47]  Cantu has not challenged on appeal the district court's decision to proceed to the guilt-innocence verdict with only eleven jurors, and we perceive no error in the district court's permitting that same truncated jury to reach the special verdict on the forfeiture issue as well.

III

CONCLUSION

For the foregoing reasons, the conviction of Javier Lopez Cantu and the judgment of forfeiture are

AFFIRMED.

---

[47]Our decision in United States v. Webster, 162 F.3d 308 (5th Cir. 1998) is not to the contrary.  In Webster, we addressed a district court's authority to replace with an alternate a juror who had been dismissed for cause after the return of the guilt-innocence verdicts and during the separate punishment proceeding. We held that the district court did not have the authority to do so because Fed. R. of Crim. P. 24(c) required the court to dismiss all alternate jurors once the jury "retire[d] to consider" the guilt-innocence verdicts.  Id. at 347.  The present case is distinguishable on two important grounds.  First, it concerns the district court's authority under Fed. R. of Crim. P. 23(b) to permit the jury to proceed to a verdict with only eleven jurors, rather than its authority to replace a juror with an alternate. Second, it involves only a brief proceeding to reach a special verdict regarding forfeiture consisting of just one witness, rather than a truly separate trial to determine the defendant's punishment featuring new witnesses and new evidence.

20