**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 2, 2009

Charles R. Fulbruge III
Clerk

No. 07-41224

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

JUAN ZUNIGA

Defendant - Appellant

Appeal from the United States District Court
For the Southern District of Texas, Corpus Christi Division
2:07-CR-123

Before KING, STEWART, and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

A jury convicted Juan Zuniga of conspiracy to possess with the intent to distribute more than five kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. Zuniga challenges the sufficiency of the evidence supporting his conviction and the district court's admission of certain testimony, which he argues should have been excluded as prejudicial. For the reasons stated below, we affirm.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

# I. FACTUAL AND PROCEDURAL BACKGROUND

On March 14, 2007, Zuniga was charged in a one-count indictment alleging that he:

> did knowingly and intentionally conspire and agree with other persons known and unknown to Grand Jurors, to knowingly and intentionally possess with intent to distribute a controlled substance. This violation involved more than five kilograms of cocaine, a Schedule II controlled substance.
>
> In violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A).

The government's theory was that Zuniga hired several people to drive cars loaded with cocaine stored in hidden compartments from Mexico across the border to Brownsville and then to Dallas. Zuniga himself would not drive; instead, he would fly to meet each driver in Dallas.[1] Once there, Zuniga would disappear with the car for several hours before returning it to the driver.

The cars used in this operation were purchased by the drivers and registered in their respective names at Zuniga's direction. The drivers communicated with Zuniga via "Boost" mobile phones—essentially a two-way radio—that had been activated using false names and addresses. Over these phones, Zuniga instructed the drivers on where to cross the border and where to drive once they arrived in Texas. Zuniga paid the drivers an average of $3,500 per trip from Mexico to Dallas. Three of the drivers involved in this operation who testified against Zuniga were caught carrying substantial quantities of cocaine in their cars' hidden compartments. However, no evidence directly connected Zuniga to the drugs—no one saw him handle drugs and he was never caught driving a car with drugs in it. The government's case was primarily based on the testimony of the co-conspirators.

---

[1] The government introduced records showing Zuniga had flown at least 69 one-way flights from Brownsville to Dallas on Southwest Airlines during the course of the conspiracy.

On July 28, 2007, Zuniga was convicted after a five-day jury trial. On November 30, 2007, he was sentenced to 336 months imprisonment, a life term of supervised release, and a $10,000 fine.

## II. DISCUSSION

"We review the district court's denial of a motion for judgment of acquittal de novo." *United States v. Delgado*, 256 F.3d 264, 273 (5th Cir. 2001). "The jury's verdict will be affirmed if a reasonable trier of fact could conclude from the evidence that the elements of the offense were established beyond a reasonable doubt. In assessing the sufficiency of the evidence, we do not evaluate the weight of the evidence or the credibility of the witnesses, but view the evidence in the light most favorable to the verdict, drawing all reasonable inferences to support the verdict." *Id.* (citation omitted). "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence." *United States v. Infante*, 404 F.3d 376, 384–385 (5th Cir. 2005). "'Circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, . . . be sufficient to constitute conclusive proof.'" *United States v. Montoya-Ortiz*, 7 F.3d 1171, 1177 (5th Cir. 1993) (quoting *United States v. Roberts*, 913 F.2d 211, 218 (5th Cir. 1990)).

21 U.S.C. § 841(a) makes it unlawful to "knowingly or intentionally . . . manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 846 states that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

"To prove a conspiracy to possess and distribute a controlled substance, the government must prove beyond a reasonable doubt (1) the existence of an

3

agreement between two or more persons to violate narcotics laws, (2) knowledge of the conspiracy and intent to join it, and (3) voluntary participation in the conspiracy." *United States v. Peters*, 283 F.3d 300, 307 (5th Cir. 2002). "An express agreement is not required; a tacit, mutual agreement with common purpose, design, and understanding will suffice." *Infante*, 404 F.3d at 385. The jury may consider "'concert of action,' presence among or association with drug conspirators, and 'evasive and erratic behavior'" as circumstantial evidence of a drug conspiracy. *Peters*, 283 F.3d at 307. However, the "mere presence or association with drug conspirators alone cannot establish that a person has voluntarily joined that conspiracy." *Id*.

Zuniga argues that there was insufficient evidence presented at trial from which a reasonable jury could conclude that he had knowledge of the drug conspiracy.[2] The basis of his argument is that no witness ever testified that Zuniga directly informed him of the contents of the cars. Instead, each witness assumed that he was transporting drugs based on the circumstances of the trip and the amount of money Zuniga paid him. Zuniga avers that the evidence only proves that he paid the drivers to transport cars, not drugs. We disagree. Zuniga cannot be exculpated by the fact that he kept his drivers in the dark regarding the exact contents of the cars. There was sufficient evidence to show that Zuniga was the organizer and leader of this operation; therefore, the jury could have concluded beyond a reasonable doubt that Zuniga had knowledge of the cars' content and the conspiracy's purpose because he was its architect.

The government highlights several topics in the testimony that point to Zuniga as the leader of the operation: (1) he hired and paid the drivers; (2) he

___

[2] To the extent that Zuniga's arguments may be construed to contend that the testimony of his co-conspirators is incompetent evidence because of their plea deals with the government, such argument is foreclosed by this court's precedent. *See, e.g.*, *United States v. Westbrook*, 119 F.3d 1176, 1190 (5th Cir. 1997).

4

controlled the drivers' itineraries; (3) he repeatedly told the drivers not to ask questions about the contents of the vehicles; (4) he gave the drivers cash to buy the vehicles used in the operation and instructed them as to which vehicles to purchase; (5) he instructed the drivers to communicate with him using phones that he had them activate under fake names; and (6) he paid for counsel to represent the drivers when they got arrested.

## A.    Hiring and payment of the drivers

Marciel Castillo, a childhood friend of Zuniga, was the first individual hired as a driver. In 2001, Zuniga approached Castillo and asked if he was interested in making some extra money by being Zuniga's driver. Castillo described Zuniga as having "recruited" him. Castillo would drive Zuniga from his home in Brownsville to Matamoros, Mexico. While in Mexico, Zuniga directed him to drive to a specific store where a different car would be waiting. Castillo would then drive that car back across the border, and Zuniga would drive back in the car that they originally drove from Brownsville. Zuniga never crossed the border into Texas in the same car as Castillo. Later, Zuniga instructed Castillo to drive to Dallas and check into a hotel. Zuniga did not drive to Dallas, but he would later arrive at the hotel to use the car for several hours. After Zuniga returned the car to the hotel, Castillo was instructed on where to return it in Mexico. Castillo testified that no one other than Zuniga paid him for these trips. Castillo exited the conspiracy without ever being arrested.

Castillo approached Roberto Ysasi, his second cousin, about becoming a driver for Zuniga. Castillo told Ysasi that he was transporting drugs, but he did not know what specific drug. Although Castillo first approached Ysasi, it was Zuniga who ultimately offered him employment as a driver, and Ysasi understood that he was working directly for Zuniga, not Castillo. Ysasi's trips mirrored those described by Castillo. Ysasi was arrested on September 28, 2006,

5

after border agents discovered six kilograms of cocaine hidden in the car he was driving.

Rafael "Angelo" Pellot, one of Ysasi's cousins, met Zuniga at a party in late 2005. Soon thereafter, he was approached by Ysasi about becoming a driver for Zuniga, but it was Zuniga, again, who actually offered him the job. Pellot testified to performing his driving duties in approximately the same way as Castillo and Ysasi. Pellot also testified that Zuniga was the only one who paid him. Apart from the normal Mexico to Dallas trips, Zuniga directed Pellot to pick up a Jeep in Houston and drive it back to Dallas. On this trip, Pellot was pulled over for speeding and the police discovered $75,000 in cash hidden inside the firewall of the Jeep. Pellot was arrested for money laundering, and the car and cash were confiscated. Zuniga stopped using Pellot as a driver for several months, but their relationship eventually resumed. Pellot was arrested a second time while crossing the border into Texas after agents found fifteen pounds of cocaine in the car's hidden compartment.

Zuniga told Pellot that he was buying another car and would need to hire another driver. Pellot suggested his friend Jose Compean. Pellot approached Compean and described the job, including Pellot's impression that there were drugs in the cars. In February 2005, Zuniga set up a meeting with Compean at Pellot's house. At this meeting, they did not discuss employment. However, at the conclusion of this meeting, Zuniga took Compean on his first trip to bring cars across the border. After that, Compean was employed by Zuniga in essentially the same capacity as Pellot, Ysasi, and Castillo. On August 4, 2006, Compean was arrested crossing the border after a canine unit alerted agents to the backseat of the car which concealed thirty pounds of cocaine.

Katherine Leal was Compean's girlfriend during the time he worked for Zuniga. She testified that on the night that Compean was arrested crossing the border, Zuniga called her and asked her to go through the checkpoint to see if

6

Compean had been detained because he stopped answering his phone and had not checked in with Zuniga as instructed. Although she was never employed by Zuniga, she followed these directions.

B.    Control and direction of the operation

"[K]nowledge of the existence of drugs may be inferred from control over the location in which they are found." *United States v. Moreno,* 185 F.3d 465, 471 (5th Cir. 1999). Castillo, Pellot, and Compean each testified that Zuniga was the only one who knew where to pick up the cars in Mexico, and he had possession of the keys to those cars. After they crossed the border into Texas, the drivers were required to check in with Zuniga, who would give them directions on where to drive the car. Compean testified that he was driving behind Pellot the day Pellot was arrested. Compean stated that he called Zuniga for instructions and was told to keep driving to Brownsville.

Castillo also testified that while he was driving across the border, Zuniga would tell him "don't be nervous, just cross it." Castillo understood that the purpose of these directions was to avoid becoming conspicuous to a border agent because the car was loaded with drugs.

In Dallas, Zuniga would specify which of several hotels the drivers were to stay in and would provide them with money to pay for the accommodations. Each driver testified that Zuniga was the only one who had control over the cash during these trips. Pellot testified that when they crossed the border with a large amount of cash in the car, Zuniga would divide up the money so that each of them had less than $10,000 because any amount more than that needed to be declared upon entry. After crossing, Zuniga would take the money back and pay the drivers.

C.    The drivers' lack of knowledge

Castillo testified that Zuniga never told him what they were transporting but that his common sense led him to believe he was transporting drugs. When

7

Castillo would ask what they were doing, Zuniga replied that he should just do what he is told and ask no more questions. Castillo had to quit the conspiracy after Zuniga became suspicious Castillo had divulged the nature of their operation to his ex-wife.

When Pellot asked Zuniga what he was transporting, Zuniga became angry and told Pellot that he did not need to know the answer and that he should just follow directions. However, when Pellot asked Ysasi about the contents of the cars, he was told that it was "gold." He testified that he assumed they were transporting cocaine because the cars did not have the odor of marijuana.

Ysasi similarly testified that he asked Zuniga what was in the cars, but Zuniga only told him to not worry about the contents and just drive.

D.    Purchase and use of cars

Pellot testified that Zuniga instructed him to purchase a Chevy HHR. He and Compean located a vehicle at a used car lot and took it for a test drive. Zuniga directed them to drive the car to him during the test drive so that he could inspect it. Zuniga then gave Compean $12,000 in cash to buy the vehicle. The car was purchased in Leal's name because of her good credit. This was the second time Zuniga had directed Compean to purchase a vehicle, and he registered it under Leal's name.[3] Leal also allowed Compean to rent cars using her name on several occasions. Pellot also testified that, after they purchased the HHR, Zuniga drove it to Mexico to have a hidden compartment installed. Pellot testified that none of the vehicles he drove for Zuniga was ever registered

---

[3] On the other occasions that Zuniga instructed Compean to purchase a car, he would provide the specific make, model, year, and color that Compean was to purchase. For each of these cars, Zuniga would inspect them during the test drive.

in Zuniga's own name because "he [did not] want to be involved if we g[o]t caught."[4]

After the HHR was impounded and Compean was arrested, Zuniga arranged a meeting with Leal in the parking lot of a Wal-Mart store. At this meeting, Zuniga promised Leal that he would pay off the remaining balance of the HHR, which was still registered in her name. Zuniga did not, however, follow through on this promise.

Compean also testified that Zuniga had asked him to register two cars in his own name. Zuniga told Compean that he needed do this so that he would be less conspicuous if he got stopped crossing the border. Ysasi testified that Zuniga gave him money to purchase three cars. He was told to register the cars in his name because it made crossing the border easier as the agents would ask less questions if the driver's and owner's name matched.

E.    Purchase and use of mobile phones

All of the drivers testified that they communicated with Zuniga during their trips via two-way mobile phones known as "Boost" phones. They also testified that Zuniga instructed them to activate these phones using fake names and addresses.

Castillo testified that Zuniga's phone number changed four or five times during the course of his employment. Pellot stated that Zuniga would change phone numbers roughly twice a month. Ysasi testified that Zuniga's number would change every four months. He stated that he went through ten mobile phones during the time he worked for Zuniga. Compean testified that Zuniga would change phone numbers about once a month. He also stated that all of the members of the conspiracy would change numbers after there was an arrest or

---

[4] Compean also stated that, to the best of his knowledge, he never drove a car registered in Zuniga's name.

9

when a car was intercepted so that the police could not trace the arrested driver's phone back to any other members of the conspiracy.

F.    Payment of co-conspirators' attorney's fees

After Pellot was released from custody in connection with the confiscated $75,000, he was picked up by a man named Mr. Garza who introduced himself as his lawyer.  Pellot had not hired him or ever met him.  Upon learning that Pellot had been arrested, Zuniga gave Pellot's wife $5,000 cash to hire a lawyer, but he told her she must hire Garza.  Pellot testified that Garza gave him no legal advice and only asked if he had agreed to cooperate with the police.  When Pellot arrived home, Zuniga accused him of lying about the arrest and demanded documentation showing that the police had taken the $75,000.

Zuniga also paid for an attorney to represent Compean after he was arrested crossing the border on August 4, 2006.  In September 2006, Zuniga gave Leal a vehicle to sell for cash to use for Compean's attorney's fees.  Later that month, he gave her $5,000 in cash for more attorney's fees.

Ysasi testified that he did not pay for the first attorney that represented him after he was arrested.  He assumed that Zuniga had hired this attorney because no one in his family could afford it.

G.    Analysis

Zuniga argues that the evidence is not sufficient to support his conviction. However, the testimony presented at trial overwhelmingly points to Zuniga as the organizer and leader of this conspiracy.  He made the hiring decisions and was the only person paying the drivers; he informed the drivers when there were trips to be made; he paid for the cars used to transport the drugs and had the drivers register the cars in their own names to avoid detection by border agents; he was the only party who knew where the cars would be located in Mexico, and he had possession of the keys; he would instruct the drivers where to go in Texas after they crossed the border; he directed the drivers to use mobile phones

registered in fake names so that they would not be traced back to him; he refused to answer the drivers' questions about the contents of the car, leading them to assume they were moving drugs; and he paid for the drivers' legal counsel when they were arrested. From these circumstances, a reasonable jury could conclude beyond a reasonable doubt that Zuniga had knowledge that the cars contained a controlled substance. Accordingly, his sufficiency of the evidence argument fails.

Zuniga secondly argues that the district court erred by allowing Compean's statement that he did not initially mention Zuniga's name to law enforcement out of fear for the safety of his family. Compean's exact testimony, which occurred on the third day of trial, was as follows:

Counsel: Was there any other reason you had never mentioned Mr. Zuniga's name before your debriefing with the agents?
Compean: I fear for my safety and my families [sic].
Counsel: Why?
Compean: Because of the stories that I heard.

Zuniga's counsel then objected, arguing that the testimony was prejudicial under Rule 403 of the Federal Rules of Evidence. The district court overruled the objection, concluding that the defense had already raised the subject. Zuniga claims that his objection should have been sustained as this testimony was prejudicial and lacked probative value because it was not relevant to establishing any element of the conspiracy.

Similar testimony occurred twice during trial, prior to the complained-of statement. On the first day of trial, Castillo testified that he quit working for Zuniga after Zuniga became suspicious that he told his ex-wife about the nature of their operation. Specifically, he testified:

Counsel: Did Mr. Zuniga tell you whether or not anything would happen if you told someone?

11

| | |
|---|---|
| Castillo: | (\*\*\*) like a threat or sometimes. It's not like a threat—yeah, like a threat, like, hey, she didn't know? You know they're going to do something to you or something if they know information. |
| Counsel: | Did you believe he could follow through with that threat? |
| Castillo: | Yes, ma'am. |
| . . . | |
| Counsel: | Do you have specific knowledge that Mr. Zuniga could follow through with his threat? |
| Castillo: | Right now, I don't know, ma'am. |
| Counsel: | Mr. Castillo, are you nervous today? |
| Castillo: | Yes, ma'am. |
| Counsel: | Why are you nervous? |
| Castillo: | I've never been in a court, and he's like staring me down or something like that. |
| Counsel: | Who's staring you down? |
| Castillo: | Zuniga |

Zuniga's counsel then made a general objection, not under Rule 403, and the district court immediately overruled it.

On the second day of trial, Pellot testified that he did not initially cooperate with the agents who arrested him. Zuniga's counsel did not object at any point during this exchange. Pellot's testimony was as follows:

| | |
|---|---|
| Counsel: | What did you tell [the agents]? |
| Pellot: | Well, I told them that I was afraid, you know, and I couldn't say anything else because I was afraid for my life. |
| Counsel: | Why? Why did you tell them that? |
| Pellot: | Because of what is lost [i.e., $75,000 in cash], because I know if I say something in that moment, I mean, I could get hurt, and not only me, my family. |
| Counsel: | You knew that you could get hurt or your family? |
| Pellot: | Yes. |
| Counsel: | How did you know that? Why did you think that? |
| Pellot: | Because I heard that is, you know, what I heard is that people get hurt if, you know, if you open your mouth. And not only you, they go after your family. |
| Counsel: | Were you ever threatened? |

| | |
|---|---|
| Pellot: | I felt threatened. |
| Counsel: | Why? |
| Pellot: | Because sometimes I heard that he, I mean Mr. Zuniga went with some people in my house and they showed them where I was living. |
| Counsel: | That they were going to show up at your house or that they did? |
| Pellot: | [Zuniga] did. He showed the boss or whoever. |

We review the district court's admission of Compean's statement for abuse of discretion. *See United States v. Cantu*, 167 F.3d 198, 203 (5th Cir. 1999). If the district court erred in admitting this statement, "we must determine additionally whether the admission of the testimony was harmless." *Id.*

Even assuming that it was an abuse of discretion for the district court to overrule Zuniga's objection to Compean's testimony, such error was harmless. Castillo's and Pellot's similar testimony occurred prior to Compean's statement, so the admission of this statement would have resulted in no harm. Additionally, there was an overwhelming amount of evidence pointing to Zuniga as the leader of the conspiracy, which also supports a finding of harmless error.

### III. CONCLUSION

For the reasons stated above, we AFFIRM Zuniga's conviction.