**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 00-40587

UNITED STATES OF AMERICA

Plaintiff-Appellee,

v.

RONNIE DONNELL PETERS, also known as Cuda, also known as Coota; SHANNON
BERNARD PETERS, also known as Six Flags, also known as Shane, also known as Hazelwood;
VELMA ALTISE BOYD, also known as Tese; ROGER QUINCY EDMONSON

Defendants-Appellants.

Appeals from the United States District Court
For the Eastern District of Texas, Sherman Division

February 14, 2002

Before EMILIO M. GARZA, PARKER, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

Ronnie Donnell Peters, Shannon Bernard Peters, Velma Altise Boyd, and Roger Quincy

Edmonson (collectively "Defendants" or "Appellants") were among 16 people indicted and convicted

on drug-related charges in Sherman, Texas following a six-month undercover operation. The

Appellants appeal from their convictions of conspiracy to possess with the intent to distribute crack

1

cocaine, possession with intent to distribute crack cocaine, and aiding and abetting possession with the intent to distribute crack cocaine. Ronnie Peters and Shannon Peters also appeal from their sentences. For the reasons assigned, we affirm the convictions and sentences appealed from.

FACTS AND PROCEDURAL HISTORY

In response to a request by local police, a team of agents from the United States Drug Enforcement Agency (collectively "DEA") went to Grayson County, Texas to investigate crack cocaine[1] dealing in Sherman and Denison, Texas. The investigation involved controlled purchases of drugs using a paid confidential informant, Diana Story, and undercover officers. Law enforcement personnel recorded and monitored the drug transactions between Story and the suspects.

On November 19, 1999, a grand jury in the Eastern District of Texas returned a 38 count indictment against Appellants and 11 other individuals. On December 9, 1999, the grand jury returned a superceding indictment in which 16 defendants, including these appellants, were charged with conspiracy to possess with the intent to distribute cocaine base in violation of 21 U.S.C. § 846 (Count 1). In addition, the indictment charged Ronnie Peters with two counts of aiding and abetting possession with the intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Counts 33 and 35). Ronnie Peters's older brother, Shannon Peters, was charged with one count of aiding and abetting possession with the intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count 32). Velma Boyd was charged with two counts of aiding and abetting possession with the intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Counts 15 and 18) and with one count of possession with intent to

_____

[1]"Crack cocaine" is the common name for the statutory term "cocaine base." Both terms are used here. Crack is a potent, crystalline form of cocaine. 3 *Oxford English Dictionary* 1097 (2d ed. 1989).

distribute cocaine base in violation of 21 U.S.C. § 841(a)(1) (Count 25). The indictment charged Roger Edmonson with one count of aiding and abetting possession with the intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count 30). The 11 other defendants entered guilty pleas to the conspiracy charge and several testified at Appellants' trial.[2]

Although the investigation involved scores of transactions, we refer here only to those pertinent to the issues raised on appeal. DEA agents captured many of these transactions on videotape, audiotape, and in photographs.

Diana Story, the confidential informant, testified that on June 24, 1999, she was driving to a suspected dealer's house to purchase crack cocaine as part of the undercover operation when she was flagged down by Joshua Delmast who offered to sell her $100 worth of crack cocaine. Story knew Delmast from a previous sale of drugs he had made to her. Delmast told Story that his girlfriend, Appellant Velma Boyd, would deliver the crack cocaine. Story waited with Delmast until Boyd arrived and gave .57 grams of crack cocaine to Delmast, who in turn sold it to Story for $100. (Videotaped and photographed).

On July 7, 1999, Story went to Delmast and Boyd's home to purchase crack cocaine. Story saw Boyd take crack cocaine out of her purse and enter a back room. Later, Delmast and Boyd came out of the back room and Delmast gave 3.7 grams of crack cocaine to Story. Story gave $500 in cash to Boyd for the drugs. (Videotaped).

On July 29, 1999, Story returned to Delmast and Boyd's residence where she paid $340 for 3.4 grams of crack cocaine that she received from Boyd alone. Boyd also gave Story her phone

---

[2]Anita Orr was charged with one count of aiding and abetting possession with the intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 and with conspiracy to possess with the intent to distribute. The jury found her guilty on both counts. She did not file a direct appeal.

number and told her to call if she ever needed anything. (Videotaped).

On August 12, 1999, Story went to Delmast's house to purchase $1200 worth of crack cocaine. When she arrived, Delmast told her to meet him at a car wash and Story agreed. At the car wash, Appellant Roger Edmonson approached Story in her car and exchanged 7.5 grams of crack cocaine for cash. Story testified that she had not seen or met Edmonson before this transaction. (Videotaped). DEA Special Agent Carol Wilson testified that she observed the crack cocaine deal between Edmonson and Story from a nearby location. Wilson confirmed that Delmast was driving the car that brought Edmonson to the car wash.

On August 18, 1999, Story telephoned Charles Bowen and arranged to buy some crack cocaine from him. The DEA recorded that phone call. Story went to Bowen's house, where they arranged to meet later at a Piggly Wiggly grocery store. Once at the store, Bowen drove next to Story's vehicle and told her to follow him to a car wash. At the car wash, Ron McKinney, Bowen's passenger, delivered 4.4 grams of crack cocaine to Story in exchange for $300. (Videotaped).

Officer Charles Smith of the Sherman Police Department testified that on August 18, 1999, he followed Charles Bowen after he left his house in an attempt to discover who supplied Bowen with the crack cocaine that he sold to Story. Smith watched Bowen drive to Appellant Shannon Peters's house and meet with Shannon Peters. Bowen's meeting with Shannon Peters occurred after Bowen left his own house and before he met Story at the grocery store to deliver the crack cocaine.

On August 19, 1999, Story arranged to buy some crack cocaine from Melvin Orr, who lived at the Crossroads Inn. Agent Wilson was acting as one of the surveillance units that day and listened to the phone conversation between Story and Orr. Orr stated that he needed to contact his source to obtain the amount of drugs Story requested. Wilson watched as Appellant Ronnie Peters drove

4

to the Crossroads Inn and entered Orr's room. Ronnie Peters exited the room less than a minute later. Officer Smith also saw Ronnie Peters drive to the Crossroads Inn. After Ronnie Peters left, Story went to Orr's room and bought 4.7 grams of crack cocaine for $500 from him. (Videotaped and audiotaped).

On August 31, 1999, Story paged Bowen, who immediately called her back. Story told Bowen she needed some crack cocaine. Bowen said he could provide her with $300 worth and asked her to meet him at the Piggly Wiggly. They met in the grocery store parking lot where Story received 4.0 grams of crack cocaine for her money. (Videotaped and audiotaped).

While conducting surveillance on Charles Bowen on August 31, 1999, DEA Agent Doug Tramel saw Appellant Shannon Peters visit Bowen in a house shortly after Bowen's telephone conversation with Story and before Bowen met her at the Piggly Wiggly. Subsequently, Tramel saw Bowen rendezvous with Appellant Ronnie Peters after the transaction with Story at the Piggly Wiggly and hand money over to Ronnie Peters. (Photographed).

On October 21, 1999, Supervisor Carl Hudman of the Sherman Police Department observed Appellant Roger Edmonson obtain crack cocaine from Patrick Ross, who was also being investigated by the DEA. Sherman police officers stopped and searched Edmonson with his permission and found a piece of crack cocaine in a pocket of his trousers.

In addition to hearing the testimony of DEA agents and police officers, the jury reviewed the numerous videotapes, photographs, and audiotapes recorded during the investigation. Many of the defendants' alleged coconspirators also testified. Joshua Delmast, a codefendant, testified that he had known Ronnie Peters and his brother, Shannon Peters, for about five years. Delmast told the jury that Ronnie Peters supplied him with crack cocaine to sell during a six to seven month period in 1999.

5

In a typical transaction, Delmast would page Ronnie Peters when he needed supplies. When Ronnie Peters called in response to the page, Delmast would tell Peters his location and Peters would deliver the crack cocaine to him. Delmast usually bought $100 to $150 worth of crack cocaine at a time from Ronnie and resold it in smaller pieces for twice the price.

Delmast also testified that he once purchased crack cocaine from Shannon Peters when he was unable to reach Ronnie. Delmast confirmed that he had asked Boyd, who by the time of trial had married Delmast, to bring him some crack cocaine to sell to Diana Story.

Delmast testified that he sold crack cocaine to Roger Edmonson almost every Friday after Edmonson received his paycheck. He sold as much as $100 worth of crack cocaine to Edmonson at a time. He also testified that once, after he had heard on the street that Story might be associated with law enforcement, he used Edmonson to make a delivery of crack cocaine to Story and paid him $50 for the job.

Codefendant Charles Bowen testified that he sold crack cocaine on commission for Appellant Shannon Peters, Ronnie Peters's older brother, between May 1999 and November 1999. Bowen said that Shannon Peters sometimes delivered the cocaine to him at his home or asked Bowen to pick it up from his house. Bowen mainly dealt in small amounts two or three times a week.

Bowen testified that on August 18, 1999, Story called him and placed an order for crack cocaine. He told Story to meet him at a nearby grocery store. Bowen said that he left his house and met with Shannon Peters at Peters's house to obtain enough cocaine to fill Story's order. Bowen affirmed that Shannon Peters supplied him with cocaine that day. Bowen confirmed Story's testimony that he met Story at the grocery store and then drove to the car wash where she paid $300

6

for 4.4 grams of crack cocaine. Bowen denied, however, giving the proceeds of that sale to Ronnie Peters, who was dating Bowen's granddaughter at the time of the defendants' trial.

Dameon Parker, another codefendant, testified that in June of 1999 he bought about 12 grams of crack cocaine from "Cuda" (Ronnie Peters) when he was unable to travel to Dallas to purchase crack cocaine from his regular supplier. The next time Parker tried to buy from Cuda, Cuda told him that his brother was getting more from Dallas.

Codefendant Fidel Sherfield testified that he paged Ronnie Peters once during the summer of 1999 to buy some crack cocaine, but that the amount that Peters had to sell was too small. Sherfield also testified that he sold small amounts of crack cocaine to Edmonson, who lived next door to him.

Ronald McKinney, another codefendant, testified that he used and sold crack cocaine. Specifically, McKinney said that in the summer of 1999 he bought crack cocaine six or seven times from Boyd in the parking lot of the "Salt N Pepper Club" and that he also bought crack cocaine from her at her house. He also testified that he bought crack cocaine that summer from a source known as "KP" (Kenneth Perryman). Whenever McKinney bought crack cocaine from him, KP would page Shannon Peters. Shortly after the page, Shannon Peters would arrive and sell KP a "fifty" ($50 worth of crack cocaine).

Codefendant Lana Shelton testified that she purchased and distributed crack cocaine in the Sherman area and that she personally saw Shannon Peters and Ronnie Peters sell crack cocaine to her boyfriend, Cedryck Johnson, who both used and sold crack cocaine. She stated that the last time she dealt with Ronnie Peters was sometime in August 1999.

Ethan Guess, who had previously been convicted by a jury of conspiracy to distribute crack

7

cocaine in the Sherman area pursuant to a separate indictment, recounted buying crack cocaine from Shannon Peters 11 or 12 years earlier when Guess was about 14 or 15 years old. Guess had recently moved to Sherman from Dallas at that time and wanted to take over the area where Shannon Peters was selling drugs. Guess testified that Peters had a "crack house"[3] in Sherman near his own home and that he had bought cocaine from Peters to "size up the competition." Guess bought crack four times from Peters to see how much Peters was giving his clients. Guess eventually moved back to Dallas, but continued to distribute crack cocaine in Sherman.

Guess also told the jury that he had encountered Shannon Peters at a convenience store in Sherman in the summer of 1999 when he stopped to buy gas. They began to talk and Shannon Peters asked Guess if he was going out to a club that night. When Guess confirmed that he was, Peters said that he wanted to "get some work" from him. Guess explained that "get some work" meant that Peters wanted to buy crack cocaine. Later that night, Guess sold Peters $800 worth of crack cocaine. Guess also testified that he saw Peters in Dallas that summer take delivery of four and one-half ounces of crack (127 grams, worth up to $6,000) from Peters's cousin. Finally, Guess said that he had once asked Charles Bowen to sell drugs for him in the Sherman area, but that Bowen had told him that he was already employed selling drugs for Shannon Peters.

At the close of the government's case, all defendants moved for judgments of acquittal, which the court denied. After presentation of their cases, the defendants renewed their motions for judgment of acquittal, which the court again denied. The jury returned verdicts of guilty as to all defendants on all counts.

---

[3]A crack house has been defined as a house or apartment where crack cocaine is sold to addicts. *Encarta® World English Dictionary* 420 (1999).

At the time of trial, the possible sentences for a violation of conspiracy to possess with the intent to distribute, for aiding and abetting possession with intent to distribute, and for possession with intent to distribute ranged from 10 years to life imprisonment for 50 grams or more of cocaine base, 5 to 40 years for 5 grams or more of cocaine base, or not more than 20 years imprisonment for less than 5 grams of cocaine base. After reviewing and adopting the defendants' presentence reports, the district court sentenced Ronnie Peters to 78 months (6.5 years) each on Counts 1, 33, and 35. Shannon Peters received prison sentences of 360 months (30 years) on Count 1 and 240 months (20 years) on Count 32. Boyd received a sentence of 78 months' imprisonment each on Counts 1, 15, 18 and 25. Edmonson received a sentence of 60 months' (5 years) imprisonment on Counts 1 and 30. The court ordered that all sentences run concurrently. These appeals followed.

ANALYSIS

I. *Sufficiency of the Evidence*

Each of the appellants argues that the evidence was insufficient to support his or her conviction. Because each moved for a judgment of acquittal at the close of the government's case, the standard of review in assessing each challenge to the sufficiency of the evidence is whether, considering all the evidence in the light most favorable to the verdict, a rational trier of fact could have found that the evidence established the elements of the offenses beyond a reasonable doubt.[4]

To prove a conspiracy to possess and distribute a controlled substance, the government must prove beyond a reasonable doubt (1) the existence of an agreement between two or more persons to violate narcotics laws, (2) knowledge of the conspiracy and intent to join it, and (3) voluntary

---

[4]*Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *United States v. Carreon-Palacio*, 267 F.3d 381, 389 (5th Cir. 2001).

participation in the conspiracy.[5] Factors that a jury may consider in determining whether a defendant is guilty of committing a drug conspiracy crime are "concert of action," presence among or association with drug conspirators, and "evasive and erratic behavior."[6] Of course, mere presence or association with drug conspirators alone cannot establish that a person has voluntarily joined that conspiracy.[7]

To prove possession of a controlled substance with intent to distribute, the government must show beyond a reasonable doubt (1) knowing (2) possession of a controlled substance (3) with intent to distribute that substance.[8] Possession may be actual or constructive.[9] To establish aiding and abetting under 18 U.S.C. § 2, the defendant must have (1) associated with a criminal venture, (2) purposefully participated in the venture, and (3) sought by action to make the venture successful.[10] To aid and abet means to assist the perpetrator of a crime by some affirmative act intended to aid the venture, while sharing the requisite criminal intent.[11]

## A.    Ronnie Peters

Appellant Ronnie Peters argues that there is insufficient evidence to support his conviction of aiding and abetting possession with the intent to distribute 4.7 grams of cocaine base on Count 33,

---

[5] *United States v. Quiroz-Hernandez,* 48 F.3d 858, 866 (5th Cir. 1995).

[6] *United States v. Bermea,* 30 F.3d 1539, 1552 (5th Cir. 1994).

[7] *Id.*

[8] 21 U.S.C. § 841(a)(1); *Carreon-Palacio*, 267 F.3d at 389.

[9] *Carreon-Palacio*, 267 F.3d at 389.

[10] *Id.*

[11] *United States v. Garcia*, 242 F.3d 593, 596 (5th Cir. 2001).

relating to the transaction on August 19, 1999. Ronnie Peters contends that the evidence proves nothing more than that he was present at the location of a drug transaction between Story and Melvin Orr.

Three witnesses testified regarding the August 19, 1999 transaction. Diana Story testified that she placed an order to buy crack cocaine from Melvin Orr, who told her that he had to meet with his supplier to obtain the drugs. Shortly after that conversation, Agent Wilson saw Ronnie Peters drive to Orr's motel and enter Orr's motel room. Officer Smith also saw Ronnie Peters pull in and out of the parking lot of Orr's motel that day. After Ronnie Peters left, Story went to Orr's motel room and bought $500 worth of crack cocaine from Orr. The jury heard witnesses such as Joshua Delmast, Dameon Parker, Fidel Sherfield, and Lana Shelton identify Ronnie Peters as their crack cocaine supplier. This evidence is sufficient to support the jury's finding beyond a reasonable doubt that Ronnie Peters aided and abetted the distribution of crack cocaine by Melvin Orr to Diana Story on August 19, 1999.

Ronnie Peters also argues that there is insufficient evidence to support his conviction of aiding and abetting possession with the intent to distribute 4 grams of cocaine base on Count 35, relating to the transaction on August 31, 1999. Ronnie Peters contends that the evidence proves nothing more than that he contacted Charles Bowen subsequent to a drug transaction between Bowen and Story and received cash from Bowen. Furthermore, he notes that Bowen denied giving money to him that day.

Story testified that on August 21, 1999, she bought $300 worth of crack cocaine from Charles Bowen. Bowen testified that Shannon Peters supplied him with the cocaine, but refused to implicate

11

Ronnie Peters, who was dating Bowen's granddaughter at the time. However, a DEA agent, Doug Tramel, testified that after Bowen and Story consummated the deal, he watched Bowen wait in the grocery store parking lot until Ronnie Peters arrived. Ronnie Peters then walked up to Bowen's vehicle and got inside. Using binoculars, Agent Tramel saw Bowen hand Peters what appeared to be cash.

The evidence supports the jury's determination that Peters was guilty of aiding and abetting the distribution of crack cocaine on August 31, 1999 because he participated in the sale of crack cocaine to Story by accepting the cocaine deal's proceeds. From the evidence presented, the jury could infer that Bowen, after receiving cash for crack cocaine from Story, gave the cash from that transaction to Ronnie Peters. Bowen testified that Shannon Peters, Ronnie Peters's older brother, supplied him with crack cocaine from May 1999 to November 1999. Viewing the evidence in the light most favorable to the verdict, we conclude that a reasonable jury could have found that the evidence established the elements of the offense beyond a reasonable doubt.

Finally, Ronnie Peters argues that there is insufficient evidence to support his conviction on Count 1, conspiracy to possess with the intent to deliver crack cocaine, because the government did not prove that he ratified his involvement in the conspiracy after his 18th birthday on August 8, 1999. For a defendant to be charged with a conspiracy that transcends his 18th birthday, he must do something to ratify his involvement in the conspiracy after he reaches 18.[12] A juvenile "ratifies" his involvement in a conspiracy by continuing to participate in an ongoing conspiracy after his 18th

_____

[12]*United States v. Tolliver,* 61 F.3d 1189, 1200 (5th Cir. 1995), *vacated as to other def. Sterling v. United States*, 516 U.S. 1105 (1996).

birthday.[13]  However, a person who does absolutely nothing to further the conspiracy or to reaffirm membership in it after his 18th birthday cannot be held criminally liable as an adult in federal court.[14]

We have already found the evidence sufficient to support Ronnie Peters's convictions on Counts 33 and 35, involving cocaine transactions by him after he became 18 years old.  The jury could have inferred, from the evidence presented, that Ronnie Peters knew of the ongoing conspiracy to distribute crack cocaine in Sherman, Texas and voluntarily participated in the conspiracy by accepting the proceeds of the crack cocaine transaction on August 31 and by delivering crack cocaine to one of his dealers on August 19, 1999.  A reasonable jury could have found that by continuing to participate in these crack cocaine sales after he reached 18 years of age, Peters furthered the aims of the conspiracy and ratified his involvement in it.

### B.    Shannon Peters

Appellant Shannon Peters argues that there is insufficient evidence to support his conviction of aiding and abetting possession with the intent to distribute 4.4 grams of cocaine base on Count 32, relating to the transaction on August 18, 1999.  Shannon Peters contends that there is insufficient evidence that he provided crack cocaine that day to Charles Bowen, which was later sold to the confidential informant, Diana Story.  Shannon Peters contends that Officer Smith did not see him hand anything to Charles Bowen that day.  The government argues, however, that the evidence supports the jury's verdict and we agree.

Charles Bowen testified that he sold crack cocaine for Shannon Peters on commission.

---

[13] *United States v. Maddox*, 944 F.2d 1223, 1233 (6th Cir. 1991).

[14]*Id.*

Bowen said that Diana Story often asked for more cocaine than he had available and that he would have to get in touch with Shannon Peters to fill Story's orders. On August 18, 1999, Story went to Bowen's house to purchase cocaine. Bowen agreed to meet Story later at a grocery store for the exchange. According to Officer Smith, Bowen then drove to Shannon Peters's house and met with him. Shortly after that encounter, Bowen met with Story and his passenger gave her the cocaine in exchange for cash. Bowen told the jury on cross-examination that Shannon Peters gave him the crack cocaine that he later sold to Story that day. Based on this evidence, the jury could have found beyond a reasonable doubt that Shannon Peters supplied the cocaine sold to Story on August 18, 1999.

We reject Shannon Peters's invitation to reverse his conviction based on *United States v. Polk*.[15] In *Polk*, this Court found that the evidence was insufficient to support a jury's conviction of participating in or aiding and abetting a crack cocaine transaction where the only evidence linking a defendant named Carter to the transaction at issue was that a car registered to Carter transported two men to a house where they bought cocaine.[16] The government did not adduce any evidence that Carter was one of the men in the car.[17] In contrast to *Polk*, the government in this case presented sufficient evidence described above that Shannon Peters assisted the distribution of illegal drugs on August 18, 1999 by providing Bowen with crack cocaine while sharing the requisite criminal intent.[18]

Shannon Peters also argues that there is insufficient evidence to support his conviction on Count 1, conspiracy to possess with the intent to deliver crack cocaine. The evidence clearly

---

[15]56 F.3d 613 (5th Cir. 1995).

[16]*Id.* at 628.

[17]*Id.* at 630.

[18]*See United States v. Garcia*, 242 F.3d 593, 596 (5th Cir. 2001).

supports the existence of an agreement between two or more persons to violate drug laws during the period from May 1999 to November 1999 and Shannon Peters's voluntary participation in and knowledge of the agreement. Ethan Guess testified that in the summer of 1999, he sold $800 worth of crack cocaine to Peters in Sherman, Texas and saw Peters replenishing his stock in Dallas with a $6,000 purchase of crack cocaine. Lana Shelton testified that she had seen both Shannon and Ronnie Peters sell crack cocaine to her boyfriend. Ronald McKinney testified that during the summer of 1999 he witnessed several crack cocaine transactions between Shannon Peters and Kenneth Perryman, his supplier. The jury also heard the testimony of Charles Bowen that he sold crack cocaine for Shannon Peters on commission. While Shannon Peters is correct in stating that no police officer or DEA agent testified to seeing or arresting him in possession of crack cocaine, the evidence from other sources is sufficient to support a rational jury's decision to convict him of conspiracy to possess with intent to distribute crack cocaine.[19]

### C.   Boyd

Appellant Velma Boyd argues that there is insufficient evidence to support her conviction of aiding and abetting possession with the intent to distribute cocaine base on Counts 15 (the June 24th sale of .57 grams) and 18 (the July 7th sale of 3.7 grams); for possession with the intent to distribute cocaine base on Count 25 (the July 29th sale of 3.4 grams); and for conspiracy to possess with the intent to distribute cocaine base as charged in Count 1 of the indictment. Boyd contends that because no government agent or officer saw her distribute cocaine, the evidence is insufficient to support her convictions on these counts.

---

[19] *See United States v. Cathey*, 259 F.3d 365, 368 (5th Cir. 2001) ("It is well-settled that credibility determinations are the sole province of the jury.")

As in most drug trials, the government's case did not rely solely on the eyewitness testimony of officers and agents. Confidential informant Diana Story testified that on June 24, 1999 she watched Boyd deliver crack cocaine to Delmast so that he could sell it to Story. DEA agent Doug Tramel testified that he saw Boyd driving the car that delivered the crack cocaine that day. On July 7th, when Story visited Boyd and Delmast at their home, she saw Boyd take cocaine out of her purse and then walk into a back room of the house with Delmast. When Delmast and Boyd returned from the back room, Delmast handed Story crack cocaine. On July 29th, Boyd sold crack cocaine directly to Story when Delmast was not around. Furthermore, Story and the DEA videotaped each of these transactions, giving the jury the opportunity of watching Boyd in action.

Numerous codefendants, including her husband, Delmast, testified about Boyd's participation in the conspiracy. Delmast confirmed that Boyd delivered the cocaine he sold to Story on June 24th. Ronald McKinney testified that he bought crack cocaine from Boyd six or seven times both at her home and in a parking lot of a club that summer.

The testimony and evidence in this case clearly supports the jury's verdict on Counts 1, 15, 18, and 25. A rational trier of fact could have found that the government proved that Boyd had knowing possession of cocaine base with the intent to distribute on July 29, 1999 beyond a reasonable doubt based on Story's testimony and the videotape. Boyd's delivery of the crack cocaine to Delmast on June 24, 1999 supports her conviction of aiding and abetting possession of crack cocaine with the intent to distribute because she acted affirmatively to aid the venture and shared the criminal intent. Similarly, Boyd aided and abetted the sale of cocaine to Story on July 7, 1999 when she assisted Delmast in making a sale to Story.

16

Not only did Boyd possess crack cocaine with the intent to distribute, there was sufficient evidence that she was a member of the conspiracy distributing crack cocaine in the Sherman, Texas area that summer. She, along with her husband, agreed to supply Story with crack cocaine on numerous occasions. The jury could reasonably infer that she obtained the crack cocaine that she sold from either Delmast or Ronnie Peters.

**D.    Edmonson**

Appellant Roger Edmonson argues that there is insufficient evidence to support his conviction of aiding and abetting possession with the intent to distribute 7.5 grams of cocaine base on Count 30, relating to the transaction on August 12, 1999, and for conspiracy to possess with the intent to distribute cocaine base as charged in Count 1 of the indictment.

From the testimony introduced at trial, a rational trier of fact could have rejected Edmonson's claim that he was an innocent bystander duped into delivering drugs without his knowledge. Delmast testified that he had been selling crack cocaine to Edmonson for two years before he recruited him to make the delivery to Story on August 12, 1999. Because of his history of purchases, Edmonson had experience with the type of packaging used for crack cocaine and the methods of its delivery. Even though Delmast testified that he did not tell Edmonson what he was delivering, the evidence without dispute indicates that the drugs were visibly contained in a clear plastic bag and were recognizable as illegal drugs by a person with Edmonson's experience. Therefore, the jury could reasonably find that Edmonson was aware that he was delivering crack cocaine; and that by delivering the drugs to Story, Edmonson assisted Delmast in distribution of cocaine and shared in his criminal intent.

The government provided sufficient evidence of a conspiracy between the Peters brothers and others to distribute crack cocaine in Sherman, Texas. Edmonson's knowledge of the conspiracy is evidenced by his weekly crack cocaine purchases from Delmast, one of the lower-level drug dealers in the conspiracy. There is also sufficient evidence to support finding that he voluntarily participated in the conspiracy and intended to join it when he agreed to deliver crack cocaine from Delmast to Story for $50. Considering the evidence in the light most favorable to the verdict, a rational trier of fact could have found that the evidence as to Edmonson established the elements of both counts beyond a reasonable doubt.

II.    *Evidence of Other Crimes*

Shannon Peters and Edmonson object to the district court's decision to allow evidence of other crimes to be introduced at the trial. We review evidentiary rulings for abuse of discretion.[20]

**A.    Shannon Peters**

The trial court admitted Ethan Guess's testimony about his prior purchases of crack from Shannon Peters and Peters's operation of a crack house under the Fed. R. Evid. 404(b) exception. The court stated, "I think its probative value as evidence on the issues of intent, scheme, [and] plan, outweighs any unfair prejudice. . . . I'm admitting it as an extraneous offense and will give an instruction." In *United States v. Beechum*,[21] this Court outlined a two-step test to determine the admissibility of evidence of a defendant's prior wrongful acts. Under *Beechum*, evidence of extrinsic offenses is admissible if it is (1) relevant to an issue other than the defendant's character, and (2) the

---

[20]*United States v. Miranda,* 248 F.3d 434, 439 (5th Cir. ), *cert. denied*, 122 S.Ct. 410 (2001).

[21]582 F.2d 898 (5th Cir. 1978).

18

incremental probative value of the evidence is not substantially outweighed by the danger of unfair prejudice to the defendant.[22]  Ethan Guess's testimony that Shannon Peters previously ran a crack house in Sherman, Texas ten years ago and had sold crack cocaine to Guess was admissible under the *Beechum* test.  First, the evidence of Peters's prior sales of cocaine was relevant to issues other than his character; it was relevant to prove his knowledge of and experience with crack cocaine sales in the area and his continuing intent to sell crack cocaine.  Second, the highly probative value of this evidence was not substantially outweighed by the danger of unfair prejudice in light of the other substantial evidence that the government introduced at trial implicating Peters as a member of the conspiracy and a supplier of crack cocaine.  Finally, the trial judge instructed the jury that the testimony or evidence concerning acts allegedly committed by Shannon Peters did not constitute any offense charged, but would, at most, constitute evidence of acts similar to those alleged in the indictment and that such evidence  should only be considered for the limited purpose of determining whether the defendant (1) had the intent necessary to commit the crimes charged;  (2) had a motive or opportunity to commit the acts charged; (3) acted according to a plan or in preparation for commission of a crime; or (4) committed the acts for which he is on trial by accident or mistake.  We cannot say that the trial court abused its discretion in allowing the admission of this evidence.

**B.     Edmonson**

Under the *Beechum* test, the officer's testimony about Edmonson's possession of crack cocaine on October 21, 1999 was admissible.  The officer testified that he was watching a crack house that night as part of the DEA's ongoing investigation when he saw Edmonson meet with a man

---

[22]*Id.* at 911.

in the back yard of the house. The man gave Edmonson a plastic "baggie," which he put in his pocket. The police approached Edmonson and he agreed to a search that revealed crack cocaine wrapped in a plastic baggie in his pants. The evidence of this encounter is relevant to prove Edmonson's knowledge of and involvement in the drug distribution conspiracy. Because the jury heard abundant evidence that Edmonson regularly bought crack cocaine, there was no danger of unfair prejudice. Furthermore, the incident occurred during the time frame alleged in the indictment and was 'inextricably intertwined' with the evidence used to prove the conspiracy.[23] Such intrinsic evidence may be admitted under proper circumstances to enable the jury to evaluate all the circumstances under which the defendant acted.[24] Evidence of this cocaine transaction was part of the story of the crime, demonstrates Edmonson's knowledge and involvement in the conspiracy and is therefore admissible.

III.    *Apprendi claims*

The district court must submit to the jury any fact, other than a prior conviction, that increases the penalty for a crime beyond the prescribed statutory maximum.[25] If the government seeks an enhancement of the penalties for a crime based on the amount of drugs, the quantity must be stated in the indictment and submitted to the jury for a finding of proof beyond a reasonable doubt.[26] In this case, the indictment stated the amount of crack cocaine involved in each count, but the jury

---

[23] *See United States v. Royal,* 972 F.2d 643, 647 (5th Cir. 1992).

[24] *Id.*

[25] *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000).

[26] *United States v. Delgado*, 256 F.3d 264, 280 (5th Cir. 2001); *United States v. Doggett*, 230 F.3d 160, 164-65 (5th Cir. 2000), *cert. denied*, 531 U.S. 1177 (2001).

instructions did not include information with respect to the issue of quantity. Because the defendants did not object to the failure of the district court to include instructions with respect to drug quantity, we review for plain error.[27] Assuming that the error was otherwise plain, a jury instruction that omits an element of the offense is subject to harmless error analysis.[28] We will grant relief under this analysis only if the district court's failure to instruct the jury that it must find a specific drug quantity beyond a reasonable doubt was not harmless.[29] To determine harmlessness when a jury is not instructed as to an element of an offense, we decide whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted evidence.[30] Finally, we note that *Apprendi* requires reversal of a conviction only in those cases where a sentence exceeds the statutory maximum.[31]

Ronnie Peters was facing a statutory maximum of 20 years imprisonment and a $1,000,000 fine under the default sentencing provision.[32] The judge sentenced him to 78 months' imprisonment on each count, concurrent, and waived any fine. His sentence is within the statutory maximum and does not run afoul of *Apprendi*.

Because the judge sentenced Shannon Peters to 30 years' imprisonment, ten years more than the statutory maximum under the default sentencing provision, we must decide whether the record

---

[27]*Delgado*, 256 F.3d at 280.

[28]*Id.*

[29]*United States v. Green*, 246 F.3d 433, 437 (5th Cir.), *cert. denied*, 122 S.Ct. 280 (2001).

[30]*Id.*

[31]*United States v. Salazar-Flores,* 238 F.3d 672, 673 (5th Cir. 2001).

[32]21 U.S.C. § 841(b)(1)(C).

contains evidence that could rationally lead to a contrary finding with respect to the amount of crack cocaine attributed to Shannon Peters. Charles Bowen testified that he sold $50 worth of crack cocaine that he obtained from Shannon Peters every two to three days. The federal probation officer conservatively estimated the total amount of Bowen's crack sales during the conspiracy at 52 grams. Ethan Guess testified that he sold Shannon Peters $800 worth of crack cocaine and saw Peters purchase approximately 127 grams of crack cocaine in Dallas. The record contains undisputed evidence that Shannon Peters was responsible for the sale of at least 50 grams of crack cocaine. Therefore, the court's failure to instruct the jury that it must find a specific drug quantity beyond a reasonable doubt was harmless error.

IV.  *Sentence Enhancement*

Shannon Peters argues that the district court erred in determining that he played a management role in the conspiracy and in adjusting his sentencing upward as a result of this determination. We review for clear error a sentencing court's factual determination that a defendant is subject to enhancement.[33] "A factual finding is not clearly erroneous if it is plausible in light of the record read as a whole."[34] Furthermore, a district court may adopt facts contained in a Presentence Report (PSR) without further inquiry if the facts have an adequate evidentiary basis and the defendant does not present rebuttal evidence.[35]

The sentencing guidelines provide for an upward adjustment of three levels if the defendant

---

[33] *United States v. Cooper*, 274 F.3d 230, 238 (5th Cir. 2001).

[34] *Id.*

[35] *Id.* at 239.

was a manager or supervisor of a criminal activity that involved five or more participants.[36]  At

Shannon Peters's sentencing, the district court adopted the findings of fact contained in the PSR as

the findings of fact of the court.  The U.S. probation officer who prepared Peters's PSR noted that

he was distributing crack cocaine on a large scale basis in Sherman, Texas.  The report, based on

statements from codefendants and witnesses, stated that Peters supplied crack cocaine to his brother,

Ronnie Peters, and to Cedryck Johnson, Charles Bowen, and Joshua Delmast, who in turn

repackaged and resold the crack cocaine to other customers.  While Peters objected to the

enhancement based on his activities, he did not offer evidence that refuted the findings of the PSR.

Finding no error in the district court's determination, we deny relief on this issue.

For the foregoing reasons, the convictions of Ronnie Peters, Shannon Peters, Velma Boyd,

and Roger Edmonson and the sentences of Ronnie and Shannon Peters are AFFIRMED.

---

[36]U.S.S.G. § 3B1.1(b).  Federal guidelines assign crimes to different categories.  A base level is set for each offense category.  After the level is set by reference to the offense characteristics, adjustments can be made for the defendant's role in the offense. 5 Wayne R. LeFave, et al., *Criminal Procedure* § 26.3(e) (2d ed. 1999).  The base level for a violation of 21 U.S.C. § 841(a)(1) involving 50 grams or more of cocaine base is 32.  U.S.S.G. § 2D1.1(a)(3) and (c)(4).  Because of his criminal history and the court's determination that he play ed a management role in the conspiracy, Shannon Peters's total offense level was 37.  The guideline range for imprisonment at this offense level is 360 months to life.  U.S.S.G. Sentencing Table, Zone D.