IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 25, 2008

Charles R. Fulbruge III
Clerk

No. 07-10873

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

SHERRY MATHEWS; EDMOND WRIGHT

Defendants-Appellants

Appeals from the United States District Court
for the Northern District of Texas
USDC No. 3:06-CR-252

Before BARKSDALE, BENAVIDES, and DENNIS, Circuit Judges.

PER CURIAM:[*]

Sherry Mathews and Edmond Wright ("Defendants") appeal from their convictions following a jury trial of offenses relating to a scheme to smuggle contraband into the Federal Correctional Institution at Seagoville, Texas ("FCI Seagoville"). Defendants challenge the sufficiency of the evidence to support their convictions. Wright also claims the district court abused its discretion by admitting out-of-court statements made by one of his alleged co-conspirators and argues the district court erroneously applied a leadership-role enhancement in

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

calculating his sentence.  We disagree, and for the reasons set forth below, we AFFIRM.

## I.   BACKGROUND FACTS

Wright was an inmate at FCI Seagoville, a minimum security federal prison, and worked as the inmate clerk for the prison's Interlibrary Loan Program ("ILL Program").  The ILL Program allowed inmates to request books from other libraries.  Wright worked alone in his position, and was responsible for processing incoming boxes of books and distributing the books to other inmates.  Mathews was Wright's long-term girlfriend and was not incarcerated during the periods relevant to this case.

In early 2005, Ramon Rentas ("Rentas") and Steve Salazar ("Salazar"), who were inmates at FCI Seagoville, conspired to smuggle contraband into the prison using books and false-bottom boxes.  Rentas instructed Salazar on how to hide contraband in the spine of the books and in false-bottom boxes.  Rentas also directed Salazar to have a family member send the packages to the ILL Program and provided him with mailing labels to use on the packages.  The labels were addressed to the FCI Seagoville ILL Program and bore the return address of the Arlington Public Library.  During family visitation, Salazar convinced his mother, Armadina Salazar ("Nina"), to participate in the scheme and gave her the labels he received from Rentas.

 In mid-April 2005, the mail room intercepted Nina's first shipment, which was a false-bottom box containing four books but no contraband.  Lieutenant David Munoz of the prison's Special Investigations Section concluded the box was a test and permitted it to reach the ILL Program.  On April 30, 2005, the mail room intercepted Nina's second shipment, a box of books in which Lt. Munoz found creatine, a nutritional supplement that the prison considered contraband.  Because the box contained contraband, Lt. Munoz did not permit it to reach the ILL Program.

In early July 2005, Wright directed Mathews to give Nina $300.00. Mathews did so, and Nina used that money (and other sums) to purchase two ounces of methamphetamine. The mail room intercepted Nina's third shipment on July 12, 2005. This shipment was two large envelopes with labels addressed to the ILL Program with the return address of the Arlington Public Library. Inside the envelopes, Lt. Munoz found small bags containing two ounces of methamphetamine hidden in the spines of four hardcover books. Lt. Munoz contacted the FBI, which began an investigation in conjunction with the prison. Lt. Munoz started monitoring Wright's phone calls because he was the ILL Program's only inmate-employee. On July 28, 2005, the mail room intercepted a fourth shipment, a false-bottom box of four books. Inside the false bottom, Lt. Munoz found contraband including a cell phone, a cell-phone charger, a cell-phone earpiece, creatine, and pornography.

The indictment contained three counts. The first count charged both Wright and Mathews with conspiracy to possess with intent to distribute more than fifty grams of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846. The second count charged Wright with attempt to possess, and aiding and abetting the attempt to possess, contraband in prison (methamphetamine) in violation of 18 U.S.C. §§ 1791(a)(2), 1791(b)(1), and 1791(b)(2). The third count charged Mathews with aiding and abetting the attempted provision of a prohibited object (methamphetamine) to a federal prisoner in violation of 18 U.S.C. §§ 1791(a)(1), 1791(b)(1), and 1791(b)(2).[1]

At trial, the parties generally agreed on the facts as described above. Mathews acknowledged that she sent the fourth shipment. She also admitted giving Nina $300.00. Mathews claimed, however, that she was not involved in

---

[1] The indictment also charged Steve Salazar on counts one and two, and Armandina "Nina" Salazar on counts one and three. Both entered guilty pleas pursuant to written plea agreements.

the scheme to smuggle methamphetamine into the prison and had no knowledge that Nina was going to use the $300.00 to purchase methamphetamine. Wright also argued he had no involvement in the scheme, and claims he only directed Mathews to give to Nina $300.00 in order to settle a gambling debt. The Government, however, argued that Wright orchestrated the scheme and recruited Rentas, provided Rentas with the mailing labels, and discussed the scheme with Mathews through coded telephone conversations. The Government also argued that Mathews, contrary to her assertions, was a knowing participant in the scheme.

The jury found Mathews and Wright guilty on all three counts. Mathews and Wright filed motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, both at the close of the Government's case and at the close of the evidence, which the district court denied. Defendants appeal those rulings, arguing there was insufficient evidence to support their convictions.

Wright also challenges the district court's calculation of his sentence under the Sentencing Guidelines. Specifically, Wright argues the district court erred by applying a two-level leadership-role enhancement under U.S.S.G. § 3B1.1(c). The PSR applied a base offense level of 26. The PSR added a two-level enhancement pursuant to § 2D1.1(b)(3) because the offenses involved distribution of controlled substances in a correctional facility and a two-level enhancement pursuant to U.S.S.G. § 3B1.1(c) because Wright was a leader of the scheme. Receiving no credit for acceptance of responsibility, Wright's offense level would have been 30. However, the PSR found Wright was a career offender and assigned a higher offense level of 37 pursuant to § 4B1.1(a), which supersedes the lower offense level that would have included the leadership-role enhancement. The district court adopted the PSR's findings and application of the career-offender enhancement, and therefore found Wright's objection to the leadership-role enhancement moot. Wright's counsel agreed that Wright was

eligible for the career-offender enhancement and that the district court therefore did not need to address the leadership-role enhancement. The district court sentenced Wright to a term of 360 months' imprisonment on count one and a concurrent term of 240 months' imprisonment on count two, a sentence at the bottom of the Guidelines range.[2]

## II. ANALYSIS

### A. Sufficiency of the Evidence

While we review the district court's denial of a motion for judgment of acquittal de novo, United States v. Delgado, 256 F.3d 264, 273 (5th Cir. 2001), our review is "narrow," United States v. Moreno, 185 F.3d 465, 471 (5th Cir. 1999).[3] "In deciding the sufficiency of the evidence, we determine whether, viewing the evidence and the inferences that may be drawn from it in the light most favorable to the verdict, a rational jury could have found the essential elements of the offenses beyond a reasonable doubt." United States v. Pruneda-Gonzalez, 953 F.2d 190, 193 (5th Cir. 1992). We accept the jury's credibility determinations "[u]nless a witness's testimony is incredible or patently unbelievable." United States v. Lopez, 74 F.3d 575, 578 (5th Cir. 1996); see also United States v. Loe, 262 F.3d 427, 432 (5th Cir. 2001) (noting the jury "is free to choose among reasonable constructions of the evidence" and "retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses").

Count one alleged that Wright, Mathews, and others engaged in a conspiracy to possess with intent to distribute more than fifty grams of

---

[2] The district court sentenced Mathews to a term of 60 months' imprisonment as to count one and a concurrent term of 60 months' imprisonment as to count three. Mathews does not appeal the district court's sentencing decisions.

[3] We apply this standard of review because defendants properly preserved their insufficiency-of-the-evidence claims through motions for judgment of acquittal. See United States v. McDowell, 498 F.3d 308, 312 (5th Cir. 2007).

methamphetamine in violation of 21 U.S.C. § 846. Accordingly, as to count one, the Government was required to "prove beyond a reasonable doubt (1) the existence of an agreement between two or more persons to violate narcotics laws, (2) knowledge of the conspiracy and intent to join it, and (3) voluntary participation in the conspiracy." United States v. Peters, 283 F.3d 300, 307 (5th Cir. 2002) (citing United States v. Quiroz-Hernandez, 48 F.3d 858, 866 (5th Cir. 1995)). Because the indictment included a specific quantity amount, the Government was also required to prove beyond a reasonable doubt that the conspiracy involved more than fifty grams of methamphetamine. See United States v. DeLeon, 247 F.3d 593, 596 (5th Cir. 2001). As to count two, the Government was required to prove beyond a reasonable doubt that Wright, as an inmate of a prison, possessed or attempted to possess a prohibited object (methamphetamine). See 18 U.S.C. § 1791(a)(2). Finally, as to count three, the Government was required to prove beyond a reasonable doubt that Mathews provided or attempted to provide a prohibited object (methamphetamine) to an inmate of a prison in violation of a statute or rule. See 18 U.S.C. § 1791(a)(1).

We first discuss the evidence against Wright. The shipments, including the envelopes containing methamphetamine, were all addressed to FCI Seagoville's ILL Program, where Wright was the only prisoner-employee. Mathews admitted sending a box of contraband, which was addressed like the packages containing methamphetamine, to Wright, further establishing his connection to the scheme. That box contained the same four books prison officials discovered in the first "test" box sent by Nina. The jury could infer that Wright, as the only prisoner-employee of the ILL Program, arranged for Mathews to use those books in the fourth shipment. Salazar testified that the scheme's purpose was to smuggle methamphetamine into FCI Seagoville and distribute the drug to inmates. Salazar further testified that while he primarily interacted with Rentas, Rentas told him that Wright was orchestrating the

scheme. Salazar described Rentas as only a "messenger" who relayed communications from Salazar to Wright, further implying that Wright was leading the scheme. Rentas also told Salazar that he received the labels from Wright, and Salazar then passed them to his mother who used them on the shipments to the prison. The evidence also shows Salazar provided his mother's phone number to Rentas, who gave it to Wright, who then gave the number to Mathews -- thus enabling the cash transaction between Mathews and Nina. Indeed, there is no dispute that Wright directed Mathews to give $300 to Nina, which Nina used to purchase methamphetamine for the scheme. Finally, the testimony of FBI Agent Jason Preece established that Wright had multiple, coded conversations with Mathews in which he discussed the scheme and directed her to take actions in furtherance of the conspiracy.

That evidence is sufficient to support the jury's verdict against Wright on counts one and two. The prison's interception of packages containing methamphetamine, along with Salazar's testimony, supports the jury's finding that there was an agreement between two or more persons to violate the narcotics laws. Given the evidence and testimony that Wright not only participated in but orchestrated the scheme, the jury was entitled to find that he knew of the conspiracy, had the intent to join it, and voluntarily participated in it. The parties also stipulated that the intercepted packages had a total of approximately 50.4 grams of a substance containing methamphetamine, meaning there was sufficient evidence for the jury to conclude the Government met its burden of proving the quantity alleged in the indictment. Finally, that same evidence supports the jury's finding that Wright attempted to possess a prohibited object (methamphetamine).

Next, we turn to the evidence against Mathews. Mathews admitted that she sent the fourth shipment, which like some of the other shipments was a false-bottom box of books. Like all of the shipments, it had a mailing label

addressed to the ILL Program with a return address of the Arlington Public Library. Moreover, the fourth shipment contained the same books found in the first shipment, which is strong circumstantial evidence that she was connected to the overall scheme. Mathews also testified that she gave Nina $300, even though Mathews claimed at trial she did not know that Nina would use it to purchase drugs. Mathews admitted that she made labels for Nina to use. There was also substantial evidence that Mathews discussed the scheme with Wright, including discussions where Wright asked Mathews about methamphetamine that had been intercepted or lost in the mail. There was also a phone conversation in which Wright directed Mathews to destroy evidence and, if asked, admit sending the fourth shipment but deny knowledge of the other shipments.

The evidence is sufficient to support the jury's verdict against Mathews on counts one and three. As discussed above, there is evidence supporting the jury's finding that there was an agreement between two or more persons to violate narcotics laws and that the conspiracy involved more than 50 grams of methamphetamine. There is also circumstantial evidence that Mathews knew of the conspiracy, and that she intentionally and voluntarily joined the conspiracy. In particular, the jury could infer from the circumstantial evidence that Mathews knew the aim of the conspiracy was to smuggle methamphetamine into the prison. Mathews admitted in her testimony that she intentionally and voluntarily undertook acts that furthered the conspiracy by providing money and labels to Nina. Finally, given that evidence, the jury could conclude that she provided or attempted to provide a prohibited object (methamphetamine) to someone in prison, or aided and abetted another in doing so.

B.   Admission of Salazar's Testimony

Wright next argues that the district court abused its discretion by admitting out-of-court statements made by Rentas because that testimony is

8

inadmissible hearsay. The Government argues, as the district court ruled, that the statements are not hearsay under Federal Rule of Evidence 801(d)(2)(E) because they are statements made by Wright's co-conspirator.

"We review the district court's evidentiary rulings for abuse of discretion." United States v. Hall, 500 F.3d 439, 443 (5th Cir. 2007). "To introduce a co-conspirator statement, the government had to prove by a preponderance of the evidence: (1) the existence of the conspiracy; (2) the statement was made by a co-conspirator of the party; (3) the statement was made during the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy." Id. "The court may consider the content of the statement at issue as a factual basis for these elements." Id.; see also Bourjaily v. United States, 483 U.S. 171, 180 (1987) ("We think there is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both the defendant and declarant in the conspiracy.").

Salazar's testimony provided the factual predicate for applying Rule 801(d)(2)(E) to Rentas' statements. There was considerable evidence, even putting aside Salazar's testimony, of a conspiracy. Salazar testified that Wright and Rentas were working together to smuggle methamphetamine into the library, establishing that Rentas was a co-conspirator of Wright's. Salazar's testimony also shows that Rentas' statements were made to Salazar in an effort to recruit him to join the scheme or in providing instructions to him for executing the scheme. Accordingly, there was a basis for concluding the Rentas made the statements in the course of and in furtherance of the conspiracy. Accordingly, we find no abuse of discretion and affirm the district court's evidentiary ruling.

C.    Leadership Role Enhancement

We review the district court's interpretation of the Guidelines de novo and its factual determinations for clear error. United States v. Medina-Argueta, 454

F.3d 479, 481 (5th Cir. 2006).[4]  Wright argues the district court erroneously enhanced his base offense by applying a two-level enhancement pursuant to U.S.S.G. § 3B1.1(c).  Section 3B1.1(c) provides for a two-level enhancement "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity" involving four or fewer participants or that was not "otherwise extensive."  Wright asserts there was insufficient evidence for the district judge to find that he was an organizer, leader, manager, or supervisor of the criminal activity.  Although Wright challenges the sufficiency of the evidence supporting application of the leadership-role enhancement, the district court did not apply that enhancement.   The court instead chose to apply the career-offender enhancement.

Wright does not address the district court's application of the career-offender enhancement, but to the extent he challenges the district court's finding that his objection to the leadership-role enhancement was moot, we disagree.  Wright qualifies as a career offender because (1) he was at least eighteen at the time he committed the instant offenses, (2) at least one of the instant offenses is a felony controlled substance offense, and (3) he had at least two prior felony convictions for controlled substance offenses when he committed the instant offenses.  See U.S.S.G § 4B1.1(a).  His conviction on count one of conspiracy with intent to distribute more than fifty grams of methamphetamine carried a maximum statutory penalty of life imprisonment.  See 21 U.S.C. § 841(b)(1)(B).  Wright therefore received an offense level of 37 pursuant to U.S.S.G. § 4B1.1(b)(A).  Because Wright's offense level as a career offender was higher than it otherwise would have been, the leadership-role enhancement did not affect his sentence.  See U.S.S.G. § 4B1.1(b) ("[I]f the offense level for a career offender

---

[4] The district court used the 2006 Guidelines Manual.  "Although Booker rendered the Guidelines advisory, district courts are still required to properly calculate the advisory guidelines range prior to imposing a sentence."  United States v. Williams, 520 F.3d 414, 422 (5th Cir. 2008).

from the table in this subsection is greater than the offense level otherwise applicable, the offense level from the table in this subsection shall apply."). Thus, we affirm the district court's ruling on Wright's objection to the leadership-role enhancement.

### III.  CONCLUSION

For the foregoing reasons, we AFFIRM the Defendants' convictions and Wright's sentence.

AFFIRMED.